UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| LORI WALTERS, in her individual capacity and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 5: 21-069-DCR ) |
| V. | ) ) |
| GILL INDUSTRIES, INC., et al., | ) **MEMORANDUM OPINION** ) **AND ORDER** |
| Defendants. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Lori Walters entered into an agreement with her employer, Gill Industries, Inc., under which she could receive a bonus if she remained employed during a certain period while Gill searched for a buyer for its Richmond, Kentucky plant. Walters remained employed during the specified period, but Gill refused to pay her the bonus, claiming that Gill was only required to pay in the event it did not locate a buyer and the plant was forced to close. Because the contract is ambiguous with respect to the parties' intent, the parties' cross-motions for summary judgment with respect to Walters' breach-of-contract claim will be denied.

Additionally, because the defendants have failed to demonstrate the absence of a genuine issue of material fact with respect to Walters' claims for fraud, negligent misrepresentation, and unjust enrichment, the defendants' motion for summary judgment on those claims will be denied. However, Walters has not identified evidence that any party besides Gill Industries, Inc. played a role in her alleged claims. As a result, summary judgment will be granted in favor of Defendants Gill Corporation, GRM Automation, Inc., Gill Real

Estate Holdings Co., Gill Holding Company, Inc., Gill Acquisition Company, Gill Mexico Holdings, Inc., Gill Industries Disc., Inc., and Heron Industries, Inc. with respect to Walters' claims of civil conspiracy and joint enterprise.

## I.     Background

Gill Industries, Inc. ("Gill") was in financial distress by the time Lori Walters ("Walters") was hired as controller of its Richmond, Kentucky plant on December 9, 2019. Gill, an automobile component manufacturer headquartered in Michigan, had been searching for a buyer for its Richmond plant for several months. And if Gill did not find a buyer soon, it would be forced to wind down the business and its Richmond employees would inevitably lose their jobs. Walters was aware of Gill's financial problems, but she was looking for experience in the automotive industry and as a plant controller, so she accepted the position. [Record No. 174-1, p. 32] Walters was paid $3,269.23 bimonthly and was to receive 120 hours of paid time-off annually. *Id.* at 37.

After negotiations with two buyers ultimately fell through, Gill was forced to begin its wind-down process. However, Gill did not give up on locating a buyer. Gill President David DeGraaf traveled to the Richmond plant on or around March 10, 2020, and advised employees that they needed to keep working to maximize chances of selling the plant. [Record No. 174-6, pp. 40-41] DeGraaf explained in his deposition, "in this situation we want to make sure that everyone stays to conduct operations, because in automotive, you have to maintain just-in-time delivery or you can shut down many [original equipment] plants, like General Motors, Toyota, [and] Nissan." [Record No. 171-19, p. 21] DeGraaf stated that Gill had no financial incentive to sell the company as a going concern as opposed to winding down. However,

selling the company would likely allow many Gill employees to keep their jobs. DeGraaf insisted, "[w]e were fighting for the team." *Id.* at 96.

As an incentive to keep employees working and provide them reassurance, Gill offered "retention agreements," which were drafted by Gill's attorneys at Miller Johnson. Walters' agreement reads, in relevant part:

### RETENTION AGREEMENT

. . . .

**1.     Retention Bonus**.  The Recipient will be eligible to receive a bonus in the amount of $16,346 (sixteen thousand and three hundred and forty-six dollars), less applicable withholdings and deductions and subject to the payment conditions of Section 2 below (the "Retention Bonus"), if the Recipient remains continuously and actively employed until the earlier of the following ("Payment Event"):
    a.     The Recipient's involuntary termination of employment for any reason other than for Cause (as defined below); or
    b.     December 31, 2020 . . . .

**2.     Unpaid PTO**.  During the normal course of employment, the Recipient is entitled to receive Paid Time Off ("PTO").  To the extent the Recipient has not taken PTO because of job responsibilities, the unused PTO will be added to the Final Retention Bonus Payment (defined below).

. . .

**4.     Payment of the Retention Bonus**.  If the Recipient is entitled to receive the Retention Bonus, it will be paid as follows:
    a.     fifteen percent (15%) of the Retention Bonus shall be paid on the next scheduled payroll after May 31, 2020;
    b.     fifteen percent (15%) of the Retention Bonus shall be paid on the next scheduled payroll after August 31, 2020;
    c.     the remainder of the Retention Bonus (the "Final Retention Bonus Payment") plus any unused PTO shall be paid upon a Payment Event on the next scheduled payroll after expiration of the waiver period of the Waiver and Release Agreement.
. . .

**8.     Complete Agreement**.  This Agreement sets forth the entire agreement between the parties regarding the subject matter thereof.  The Agreement

supersedes and preempts any prior understandings, agreements, policies, or representations by or among the parties, written or oral, regarding the subject matter of this Agreement. However, nothing in this Agreement affects Recipient's rights to severance benefits, if any, under the terms of the Gill Industries, Inc. Severance Plan.

The contract defines "termination of employment" by incorporating the definition of "Separation from Service as defined under Treasury Regulation § 1.409A-1(h)," which states that an employee will be separated from service when the "facts and circumstances indicate that the employer and employee reasonably anticipated that no further services would be performed after a certain date."

The parties agree that Gill and Walters executed her Retention Agreement on or around March 10, 2020. Around March 12, 2020, Gill and Walters executed a First Addendum to the Retention Agreement, which provides:

> **1.      Supplemental Retention Bonus.** The Recipient will be eligible to receive a supplemental bonus in the amount of $6,538 (six thousand and five hundred and thirty-eight dollars), less applicable withholdings and deductions (the "Supplemental Retention Bonus"), if the Recipient remains continuously and actively employed per the terms of the Retention Agreement.
>
> **2.      Conditions and Payment.** Sections 3 and 4 of the Retention Agreement apply to the payment of the Supplemental Retention Bonus. The Recipient must comply with the conditions of Section 3 of the Retention Agreement as a condition of receiving the Supplemental Retention Bonus. If the Recipient is entitled to receive the Supplemental Retention Bonus, it will be paid according to the terms and schedule of Section 4 of the Retention Agreement.

[Record No. 175-1]  Gill customers Toyota and Nissan agreed to fund the Retention Agreements on the condition the bonuses would be payable only in the event of a wind down. [*See* Record Nos. 152-3; 175-3, p. 12.][1]

---

[1]      Walters has tendered a March 2, 2020, email from a Nissan representative to Gill Chief Restructuring Officer Alicia Masse, seeking reassurance that the retention agreements will include "a clause that if a sale still happens the retention plan is eliminated." [Record No. 152-3]

Gill sold the Richmond facility to Challenge Manufacturing on April 29, 2020. While Challenge brought many of Gill's employees onto its workforce, Walters was not offered a permanent position. Instead, on April 30, 2020, Challenge brought Walters on as an independent contractor. [Record Nos. 174-2, p. 57; 174-7, p. 36] The following day, Challenge presented Walters with a document entitled, "Separation and Release of Claims," which asked her to release any claims based on the Retention Agreement and Addendum. But Walters refused to sign the release.

On May 4, 2020, Walters sent a demand letter to Amanda Fosnaugh, Gill's corporate director of human resources. [Record No. 175-5] Therein, Walters explained that she believed that she had satisfied the conditions for payment of the bonus and unused PTO outlined in the Retention Agreement and Addendum. After Gill refused to pay, Walters filed a Complaint in the Madison Circuit Court on behalf of herself and other Gill employees, seeking payment under the retention agreements. Gill removed the Complaint to this Court on March 10, 2021, based on diversity jurisdiction under 28 U.S.C. § 1332. Thereafter, Walters filed an Amended Complaint in which she named as defendants individual Gill officers and various other corporate entities that fall under the Gill umbrella of companies. The Court granted the defendants' motion to dismiss, in part, and denied the plaintiff's motion to certify a class on January 10, 2022.

The Court now considers the defendants' motion for summary judgment and the plaintiff's motion for partial summary judgment.

## II.    Standard of Review

Summary judgment is appropriate when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A genuine dispute regarding a material fact exists if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 522 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis of its motion and identifying the parts of the record that establish the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 325; *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Once the movant has met its burden, the nonmoving party must come forward with specific facts from the record to show that there is a genuine issue of material fact that is in dispute. *Chao*, 285 F.3d at 424.

The Court then determines "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 447 U.S. at 242. In making this decision, the Court construes the facts and draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

These standards do not change when the parties file cross-motions for summary judgment. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). And it does not mean that the Court must grant summary judgment for one side or the other. Instead, the Court evaluates each party's motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration.

### III. Discussion

### A. Breach of Contract

The Court begins by examining Walters' breach of contract claim, which is the subject of the parties' cross motions for summary judgment. The defendants maintain that employees were to be paid under the Retention Agreements only in the event of a wind down—not in the event of a sale. However, the language of the Retention Agreement does not provide that a wind down is a condition of payment. President DeGraaf recognized as much during his deposition when he stated that the Retention Agreement *should have* included language indicating that bonuses would not be paid in the event of a sale. DeGraaf conceded that Gill's attorneys failed to include this language when drafting the agreement and that DeGraaf did not read it prior to signing to verify that the language was included. [Record No. 171-19, pp. 17, 53-54] Gill Chief Restructuring Officer Alicia Masse also conceded during her deposition that the Retention Agreement did not distinguish what was to occur in the event of a wind down versus a sale and that she did not "flyspeck" the Agreement prior to signing it. [Record No. 175-4, pp. 5-6]

Instead, the Retention Agreement provides that that Walters is eligible to receive the bonus if she remains continuously and actively employed until the earlier of the following "payment events:" her involuntary termination of employment for any reason other than for cause or December 31, 2020. Here, it is undisputed that Walters was involuntarily terminated on or around April 29, 2020, when Challenge purchased Gill's Richmond plant. It is further undisputed that Gill's termination was not for cause.

The defendants urge the Court to invalidate the contract based on extrinsic evidence because, they contend, "the retention agreement is ambiguous as to its purpose." However, if

the *terms* of the agreement are unambiguous, the Court may not refer to parol evidence. *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (observing that, "[a]bsent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence"). "The criterion in determining the intention of the parties is not what did the parties mean to say, but rather what did the parties mean by what they said." *Id.* Accordingly, the Court cannot look to extrinsic evidence to find an ambiguity in the agreement.

The defendants' second argument is that that the payment terms of the Retention Agreement are ambiguous. The Agreement provides that, if an employee is eligible for the bonus, 15 percent shall be paid on the next scheduled payroll after May 31, 2020, 15 percent shall be paid on the next scheduled payroll after August 31, 2020, and the remainder shall be paid "upon a Payment Event on the next scheduled payroll after expiration of the waiver period of the Waiver and Release Agreement." The defendants contend that this leads to "an unclear result" if the plant is sold and is not in operation prior to the dates listed.

A contract term is ambiguous when it is reasonably susceptible to more than one meaning. *Cantrell Supply, Inc.*, 94 S.W.3d at 385. "[P]arol evidence may not be admitted to vary or contradict a written contract, but where ambiguous or uncertain terms are used, such evidence may be heard to that end that their true meaning may be ascertained by the court." *Blevins v. Riedling*, 158 S.W.2d 646, 648 (Ky. 1942).

The defendants maintain that the payment schedule, as stated in the contract, reflects the parties' intent that the bonus would be paid only the event of a wind down. They contend that, otherwise, it leads to an "unclear result." They also point to deposition testimony of

corporate officers who contend that the bonuses were only to be paid in the event of a wind down. The defendants also cite an employee meeting during which an unidentified employee raised the question: "[r]etention document implies that we will be paid whether acquired or shutdown—is this true?" During a March 16, 2020 conference call among human resources employees, Richmond's plant manager Paul Henderson, and DeGraaf, the question was answered as follows: "No, the intent is that payment would only be paid out at a shutdown. If a transaction happens, the payments will not take place." The defendants maintain that Henderson was instructed to communicate this information to the Richmond employees, but it is unclear whether he did so. Walters maintains that she was not provided this information and believed the bonus was to be paid regardless of whether the plant was sold or shut down.

Clearly, the payment schedule employs uncertain terms, as the precise dates that payments were anticipated cannot be ascertained without resorting to extrinsic evidence. When a court finds the language of a contract to be ambiguous, the jury must answer the factual questions of what the parties intended. *Clark v. Hectus & Strause, PLLC*, 345 S.W. 857, 859 (Ky. Ct. App. 2011). Accordingly, the plaintiff's motion for partial summary judgment will be denied.

### B.    Frustration of Purpose

The defendants also contend in their motion for summary judgment that Walters' breach of contract claim should fail because the purposes of the Retention Agreement were frustrated by the COVID-19 pandemic and the sale of the Richmond plant. "[T]he applicability of the doctrine of frustration depends on the total or nearly total destruction of the purpose for which, in the contemplation of both parties, the transaction was entered into." *Frazier v. Collins*, 187 S.W.2d 816, 818 (Ky. 1945). The defendants bear a heavy burden in proving the

defense of frustration. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) (quoting *Everett Plywood Corp. v. United States*, 651 F.2d 723, 729 (U.S. Ct. Cl. 1981)).

The defendants assert that the purpose of the Retention Agreement was "for the Recipient to remain employed with the Company." [Record No. 171-1, p. 12] However, according to the defendants, "almost immediately" after March 10, 2020, the Richmond plant closed due to the COVID-19 pandemic. Former Human Resources Manager of the Richmond Plant Carole Thoele testified that a "vast majority of the employees were not working during the COVID-19 shutdown." However, Thoele recalled that "[s]ome of the salaried exempt employees" remained working and were paid during the shutdown. Notably, the defendants do not allege that Walters, a salaried employee, was not working during the COVID-19 shutdown. Walters contends that she continued to work throughout this period and has provided email correspondence indicating that she filled in for another employee who was in quarantine during this time. [Record No. 175-8] Further, considering what was known about COVID-19 prior to March 10, 2020, it cannot reasonably be said that the pandemic constitutes an unforeseen supervening event that should excuse the defendants' performance.[2]

The defendants also contend that the sale of the Richmond plant frustrated a second purpose of the Retention Agreement, which was "to address any concerns about job security." [Record No. 171-1, p. 12] The defendants cite no case law in support of this argument but assert that "the vast majority of employees did not lose their jobs." Obviously, the sale to Challenge did not guarantee job security because not all employees retained their positions,

---

[2] CENTERS FOR DISEASE CONTROL AND PREVENTION, *CDC Museum COVID-19 Timeline*, https://www.cdc.gov/museum/timeline/covid19.html#Early-2020 (last visited Feb. 16, 2022).

including Walters, who was only offered a position as an independent contractor. Further, this doctrine is intended to relieve a party of duty if performance has *unexpectedly* become impracticable as a result of a supervening event. *See* Restatement (Second) of Contracts § 261 cmt. a (1981). Since selling the Richmond plant was Gill's goal, it is unclear how this could constitute an unexpected event that would justify excusing Gill's performance under the contract. Accordingly, the defense of frustration of purpose does not apply.

### C. Fraud in the Inducement and Negligent Misrepresentation

Walters asserts claims for fraud in the inducement and negligent misrepresentation based on the same core facts as her breach-of-contract claim. In addition, she reports in her response to the defendants' motion for summary judgment that "[t]hey gave everybody an incentive to stay to keep the plant running regardless of a wind-down or keeping the sale going. . . ." [Record No. 175, p. 19]

The defendants argue that these claims must be dismissed because the economic loss doctrine prevents Walters from "recasting" her breach of contract claims as tort claims. [Record No. 171-1, p. 3] The Supreme Court of Kentucky formally adopted the economic loss doctrine in *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729, 733 (Ky. 2011), in which it recognized that a commercial purchaser of a product may not sue in tort to recover for economic losses arising from a malfunction of the product—instead, such damages must be recovered pursuant to contract law.

Federal courts applying Kentucky law have refused to apply the economic loss rule to tort claims stemming from contracts for services. *See Kamps, Inc. v. Mustang Aviation, Inc.*, 2018 WL 6709714, at *3 (E.D. Ky. Dec. 20, 2018) (collecting cases); *Grace v. Armstrong Coal Co.*, 2009 WL 366238, at *4 (W.D. Ky. Feb. 13, 2009) (finding that the economic loss

rule does not apply to employment contracts).  The defendants cited the unpublished opinion in *Poynter v. Ocwen Loan Servicing,* LLC, 2016 WL 5380926, at *6 (W.D. Ky. Sept. 23, 2016), for the proposition that "Kentucky law does not permit fraud claims that are fundamentally interwoven . . . with breach of contract claims."  However, *Poynter* relies on the economic loss doctrine without explaining why it would apply to a claim based on a contract for services.  Further, *Poynter* bases its analysis on *Bisantsz v. Stephens Thoroughbreds, LLC*, 2015 WL 574594 (E.D. Ky. Feb. 11, 2015), which applied the economic loss rule to a contract involving the sale of goods.

Walters relies on *C.A.F. & Associates, LLC v. Portage, Inc.*, 913 F. Supp. 2d 333 (W.D. Ky. 2012), which is somewhat on point.  In that case, the parties entered into a written memorandum of understanding in which Portage represented that it would hire 20 full time employees to support C.A.F. if it took over management of an environmental cleanup site.  C.A.F. sued Portage for breach of contract after it failed to hire the employees, but the court determined that the memorandum of understanding was not an enforceable contract.  However, the court allowed C.A.F.'s claims for fraud and negligent misrepresentation based on its terms to go forward, observing that the economic loss rule was limited to the context of products liability.  *Id.* at *352-54.  Based on these cases, the Court is unpersuaded that Walters' claims are barred by the economic loss doctrine.

To prevail on a claim for fraud in the inducement or negligent misrepresentation, the plaintiff must identify a material representation that was false.  *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613 (Ky. Ct. App. 2011) (providing elements of fraud in the inducement); *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004) (providing elements for negligent misrepresentation).  Fraud in the inducement can lie

from a defendant "making representations as to his future intentions when in fact he knew at the time the representations were made he had no intention of carrying them out." *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010). Punitive damages are recoverable for fraud, but not negligent misrepresentation. *Pezzarossi v. Nutt*, 392 S.W.3d 417 (Ky. Ct. App. 2012); *Morton v. Bank of the Bluegrass & Trust Co.*, 18 S.W.3d 353 (Ky. Ct. App. Sept. 3, 1999); K.R.S. § 411.184.

The defendants contend that, to the extent the fraud and negligent misrepresentation claims are not barred by the economic loss doctrine, they should be dismissed because Walters failed to plead them with sufficient particularity. However, the defendants waived that argument by not raising it earlier. *See Kamps, Inc. v. Mustang Aviation, Inc.*, 2020 WL 1492761, at *7 n.7 (E.D. Ky. Mar. 27, 2020). Additionally, the defendants note that Walters has been unable to identify a misrepresentation made by any particular individual within the defendant entities. True. But the claims against the individual defendants have already been dismissed. The defendants have failed to respond to the possibility that Gill's statements within the Retention Agreement could support a claim for fraudulent inducement or negligent misrepresentation, similar to that in *C.A.F. & Associates, LLC v. Portage, Inc.*

Construing the facts in the light most favorable to the plaintiff, the oral representations and contractual terms agreeing to pay Walters a bonus if she worked through the earlier of December 31, 2020, or her involuntary termination without cause, could be considered material misstatements that she relied upon in continuing her employment at Gill. Walters also maintains that Gill's failure to include the omitted term in the Retention Agreement was no accident. Instead, she contends that Gill never intended to include a term providing that the bonus would be payable only in the event of a wind down so that employees would have a

greater incentive to keep working. Because the defendants did not address this argument on the merits, they have not met their burden of demonstrating the absence of a genuine issue of material fact. Accordingly, their motion for summary judgment with respect to the fraud and negligent misrepresentation claims will be denied.

### D. Unjust Enrichment

To prevail on a claim of unjust enrichment, a plaintiff is required to prove the following elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777-78 (Ky. 2017). A plaintiff can pursue breach of contract and unjust enrichment as alternative theories of liability based on the same core facts, but cannot recover on both. *See Boardman Steel Fabricators, Ltd. V. Andritz, Inc.*, 2014 WL 2159743 (E.D. Ky. May 23, 2014) (citing *Son v. Coal Equity, Inc.*, 122 F. App'x 797, 802 (6th Cir. 2004)).

The defendants argue that they are entitled to summary judgment on this claim because Walters has not specified "the alleged benefit" and does not "allege any benefit conferred on any Defendant." [Record No. 171-1] Specifically, the defendants cite a portion of Walters' deposition testimony in which she stated that plant customers and employees were the ones who benefited from the retention agreements. However, as noted in Walters' response, President DeGraaf stated in his deposition that Gill's "number one priority was to keep as many employees at Gill as possible," to "maintain continuity and supply [their] customers." Based on this testimony, there is a factual dispute with respect to the benefit conferred and whether there was as resulting appreciation by Gill. Accordingly, the defendants' motion for summary judgment on this claim will be denied.

### E.     Piercing the Corporate Veil

Walters' employer was Gill Industries, Inc., the original defendant in this suit. She later filed an Amended Complaint adding various other defendants within the Gill umbrella of companies, alleging that they all share the same corporate identity. The corporate defendants (with the exception of Gill Industries, Inc. and Gill Corporation) filed a motion to dismiss based on lack of personal jurisdiction. The Court denied that motion, preliminarily concluding that the corporate veil should be pierced for each of the entities and, therefore, the Court has personal jurisdiction over each of them.

The defendants now assert that "[t]he only party which could have breached the Agreement is Gill Industries, Inc., which is the only party to the Agreement." [Record No. 174, p. 11] The defendants contend that Walters has not made any argument in support of holding all defendants liable for her claims. However, in her motion for partial summary judgment, Walters briefly reiterates the argument that all corporate defendants should be held liable for Gill's alleged breach of contract based on the theory of piercing the corporate veil, which she also argued in response to the defendants' motion to dismiss. [Record Nos. 169-1, pp. 19-20; 157; 118]

Courts are reluctant to disregard the corporate entity. *Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 847 (W.D. Ky. 2007) (citing *Holsclaw v. Kenilworth Ins. Co.*, 644 S.W.2d 353 (Ky. Ct. App. 1982)). The corporate veil should not be pierced unless there is "(1) such a unity of ownership and interest that the separate personalities of the corporation and its owner cease to exist, and (2) the facts are such that an adherence to the normal attributes . . . of separate corporate existence would sanction a

fraud or promote injustice." *Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83, 95 (6th Cir. 2009).

Essentially, both parties rely on the arguments they presented when the corporate defendants filed a motion to dismiss for lack of personal jurisdiction. And the plaintiff contends that the Court is bound by its preliminary determination with respect to veil-piercing for purposes of personal jurisdiction over the corporate defendants. However, the Court is now presented with a motion for summary judgment, as opposed to a motion to dismiss for lack of personal jurisdiction and, therefore, a different standard of review applies. *See Kerns v. Caterpillar, Inc.*, 583 F. Supp. 2d 885, 891 n.1 (M.D. Tenn. 2008) (citing Fed. R. Civ. P. 12(d) ("If, on a motion under *Rule 12(b)(6) or 12(c)*, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). *See also Premier Polymers, LLC v. Wendt*, 2015 WL 6394441, at *3 (S.D. Tex. Oct. 21, 2015) (collecting cases in which a party made a *preliminary* showing of alter ego theory); *Gen. Textile Printing & Processing Corp. v. Expromtorg Intern. Corp.*, 891 F. Supp. 946, 950-51 (S.D. N.Y. 1995) (making *preliminary* finding that corporate veil should be pierced and court had personal jurisdiction over defendant).

For the reasons stated in the Memorandum Opinion and Order of January 10, 2022, the Court finds that there is a loss of corporate separateness amongst the defendants. [Record No. 172 (citing *Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 165 (Ky. 2012)] Notably, the various corporate defendants had the same owners, shared a bank account, and had the same officers for a period of several years. The defendants did not observe legal formalities, did not have meetings, and did not observe any other formalities that would

distinguish one entity from another. As previously noted, the president, chief financial officer, and chief restructuring officer had difficulty distinguishing the entities.

However, the plaintiff has failed to identify facts from the record showing that piercing the corporate veil is needed to prevent fraud or injustice. She points to Chief Financial Officer Gordon Schreur's deposition testimony concerning "ring fencing" the Richmond plant's financial accounts. Prior to early 2020, the Richmond plant and other Gill facilities used the same central revolving account at Huntington National Bank. In late February or early March 2020, the Richmond plant (along with other facilities) were "ring fenced," which meant that the facilities were given their own accounts that did not flow into or out of any other plant's accounts. [Record No. 175-3, pp. 3, 6] Schreur explained that, in the face of Gill's financial problems, customers were forced to fund Gill's operations so that the customers' supply needs could be met. The ring fencing was put in place so that customers were not "funding the issues at another plant." *Id.* at 5.

Walters suggests that the ring fencing was actually done to divert money away from Gill so that it would not be able to pay employees under the Retention Agreements. However, Schreur also testified that Gill also did not have sufficient funds in its central account to pay the bonuses *prior to* the ring fencing. And Walters' assertion that the defendants stashed money to pay to shareholders and officers is not supported by any citation to the record.

Defendants, on the other hand, have pointed to specific testimony from CFO Schreur indicating that the ring fencing had a legitimate business purpose and that *customers* had agreed to fund the Retention Agreements. According to Schreur, "we only entered into [the Retention Agreements] with the agreement that Nissan and Toyota would be funding it." *Id.* at 12. Based on this evidence, no reasonable trier of fact could conclude that the collapse of

the corporate form was used to perpetrate fraud or injustice. Accordingly, only Gill Industries, Inc. may be deemed liable for Walters' claims.

### F.       Joint Enterprise and Civil Conspiracy

A joint enterprise is an informal partnership that is limited in purpose and duration. *Abbott v. Chesley*, 413 S.W.3d 589, 604 (Ky. 2013). To establish that a joint enterprise exists, the plaintiff must show "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001). Walters alleges in her Amended Complaint that the corporate defendants acted as a joint enterprise to divert money that should have been used to fund the retention agreements. However, as previously stated, she has not identified facts from the record to support this allegation. Such unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.

Walters also asserts a claim for civil conspiracy. This is "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful action by unlawful means." *Peoples Bank of Northern Ky., Inc. v. Crowe Chizek & Co., LLC*, 277 S.W.3d 255, 260-61 (Ky. Ct. App. 2008) (quoting *Smith v. Bd. of Educ. Of Ludlow*, 94 S.W.3d 321, 325 (Ky. 1936)). As previously explained, Walters has failed to identify facts from the record suggesting that any entity or individual acted in concert with Gill Industries, Inc. to commit an unlawful act or a lawful act by unlawful means.[3]

---

[3]     The Court dismissed Walters' claims against the individual defendants (David DeGraaf, Alicia Masse, and Gordon Schreur) on January 10, 2022. [Record No. 172]

Accordingly, summary judgment will be granted in the defendants' favor with respect to these claims.

### IV.   Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. The plaintiff's motion for partial summary judgment [Record No. 169] is **DENIED**.

2. The defendant's motion for summary judgment [Record No. 171] is **GRANTED**, in part, and **DENIED**, in part.

3. The plaintiff's claims for civil conspiracy and joint enterprise are **DISMISSED**, with prejudice.

4. All claims against Defendants Gill Corporation, GRM Automation Inc., Gill Real Estate Holdings Co., Gill Holding Company, Inc., Gill Acquisition Company, Gill Mexico Holdings, Inc., Gill Industries Disc, Inc., and Heron Industries, Inc., are **DISMISSED**, with prejudice. These parties shall be terminated as defendants in this action.

5. The following claims remain pending against Defendant Gill Industries, Inc.: breach of contract, fraud in the inducement, negligent misrepresentation, and unjust enrichment.

Dated: February 18, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky